Michael Connett
Leslie L. Pescia*
Rachel N. Minder*
**SIRI & GLIMSTAD LLP**
700 South Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 376-3739
mconnett@sirillp.com
lpescia@sirillp.com
rminder@sirillp.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 599-6072
E:klaukaitis@laukaitislaw.com

**pro hac vice admission anticipated*

*Attorneys for Plaintiffs & Putative Class Members*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAROLINA RIVERA TORO and STEPHANIE BARBOSA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br>THE CLOROX COMPANY,<br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs Carolina Rivera Toro and Stephanie Barbosa ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against The Clorox Company ("Clorox" or "Defendant")[1] and allege the following based on personal knowledge as

[1] Plaintiffs reserve the right to amend the complaint to include any additional responsible parties or entities as the evidence or information may arise throughout discovery.

to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1. This is a proposed class action arising from the sale of household cleaning products contaminated with a dangerous bacterium, Pseudomonas aeruginosa, by a company that had every reason to know it. Specifically, Defendant designed, formulated, manufactured, branded, marketed, distributed, and sold scented Mistolin and Lestoil multi-purpose cleaners (the "Products" or "Recalled Products") that may contain Pseudomonas aeruginosa, an organism that can cause serious infections through inhalation, contact with the eyes, or contact with broken skin (hereinafter, the "Contamination Defect" or "Defect").

2. On September 3, 2026, the U.S. Consumer Product Safety Commission ("CPSC") announced a recall of approximately 6.3 million bottles of the Products, manufactured from April 1, 2025, through June 17, 2026, and sold to consumers throughout Puerto Rico and the U.S. Virgin Islands at Walmart, Sam's Club, Costco, Supermercados Econo, Supermercados Selectos, and other retailers ("Recall" or "Recall Notice").[2] Defendant sold the recalled units at retail prices ranging from approximately $1.40 to $8.00 per bottle.

3. Every Recalled Product contains the same contamination, is sold under Clorox-owned brands, and bears the Clorox diamond trademark together with the words "inspired by the power of Clorox."

4. Defendant is well aware of the risks associated with Pseudomonas aeruginosa. It is the same bacterium prompted that Clorox to recall approximately 37 million bottles of its scented Pine-Sol cleaners in October 2022.[3]

---

[2] U.S. Consumer Product Safety Commission, *Clorox Puerto Rico Recalls 6 Million Scented Mistolin and Lestoil Multi-Purpose Cleaners Due to Risk of Exposure to Bacteria, Recall No. 26-741* (Sept. 3, 2026), https://www.cpsc.gov/Recalls/2026/Clorox-Puerto-Rico-Recalls-6-Million-Scented-Mistolin-and-Lestoil-Multi-Purpose-Cleaners-Due-to-Risk-of-Exposure-to-Bacteria (last accessed September 14, 2026).

[3] U.S. Consumer Product Safety Commission, *Clorox Recalls Pine-Sol Scented Multi-Surface Cleaners, CloroxPro Pine-Sol All Purpose Cleaners, and Clorox Professional Pine-Sol Lemon Fresh Cleaners Due to Risk of Exposure to Bacteria*, Recall No. 23-022 (Oct. 25, 2022) https://www.cpsc.gov/Recalls/2023/Clorox-Recalls-Pine-Sol-Scented-Multi-Surface-Cleaners-CloroxPro-Pine-Sol-All-Purpose-Cleaners-and-Clorox-ProfessionalTM-Pine-Sol-Lemon-Fresh-Cleaners-Due-to-Risk-of-Exposure-to-Bacteria-1 (last accessed September 14, 2026) (the "Pine-Sol Recall Notice")

5. In January 2026, during the very period in which the Products at issue here were being manufactured, Clorox agreed to pay a $14.15 million civil penalty to resolve CPSC charges that it knowingly failed to immediately report the Pine-Sol contamination to the government, despite its own microbiologists having documented "possibly a Pseudomonad" in its storage tanks and finished product as early as 2019.[4] As part of that settlement, Clorox agreed to maintain an enhanced compliance program and to file annual compliance reports with the CPSC.

6. Defendant thus knew, from direct and expensive experience, that its scented multi-surface cleaners were vulnerable to *Pseudomonas aeruginosa* contamination; it knew the mechanism by which that contamination arises in fragranced formulations; it knew what testing was required to detect it; and it had promised the federal government that it would do better. Yet Defendant did nothing.

7. Instead, for fifteen months Defendant manufactured, branded, marketed, distributed, and sold the Products to consumers throughout Puerto Rico and the U.S. Virgin Islands, under the Clorox name and trademark, with labels declaring that each bottle was "inspired by the power of Clorox," without any warning that the Products could contain a pathogen, and then allowed the Products to remain on store shelves for months after it had ceased production.

8. Defendant knew or should have known of the contamination through its own microbial testing, pre-market safety testing, product design and engineering, quality assurance processes, warranty claims, consumer complaints and internal investigations. Defendant also had prior experience with the same bacterium, *Pseudomonas aeruginosa*, having recalled 37 million bottles of scented Pine-Sol cleaners due to contamination in October 2022. Moreover, beginning in January 2026, Defendant agreed to maintain a CPSC compliance program and internal controls as part of its settlement with the CPSC. But again, Defendant did nothing.

---

[4] U.S. Consumer Product Safety Commission, *Clorox Agrees to Pay $14.15 Million Civil Penalty for Failure to Immediately Report Bacterial Hazard with Pine-Sol Scented Multi-Surface Cleaning Products* (Jan. 27, 2026) (last accessed September 5, 2026) (the "Penalty Release")

9. Upon information and belief, Defendant failed to issue any proactive safety alerts, warnings, or ameliorative corrective measures before the CPSC recall announcement. Instead, Defendant continued profiting from sales to reasonable consumers throughout Puerto Rico and the U.S. Virgin Islands.

10. Defendant generated substantial revenue from these sales. The Products were priced from roughly $1.40 to $8.00 per bottle, and approximately 6.3 million units were sold.

11. Defendant was able to charge these premium prices through its marketing efforts and by withholding from consumers the material fact that the Products contain the Defect. Defendant knew, or should have known, that reasonable consumers prioritize safety and reliability in household cleaning products, particularly any pathogen, infection, or health hazard associated with a product. Nonetheless, Defendant failed to disclose the associated risks.

12. The Defect existed at the point of purchase. Plaintiffs and Class Members reasonably believed the Products were safe for their intended use and purchased them based on that assurance.

13. Despite the Recall, the Defect remains, leaving the Products unsafe, unfit for use, and worth substantially less than represented or warranted.

14. Each Recalled Product contains the same inherent Defect, which was present at the time of sale and creates a serious safety risk to consumers, unknown to buyers but known to Defendant. As a result, Plaintiffs and other reasonable consumers were placed at a disadvantage, subjected to Defendant's superior industry knowledge.

15. No reasonable consumer would have purchased the Products on the same terms had they known of the Defect. Defendant continued selling the Products despite knowing of the vulnerability of its scented cleaner formulations to Pseudomonas contamination. Even after the reported hazards[5] became known, Defendant continued to prioritize profit over safety. Despite

---

[5] *See also*, "An official CPSC notice concerns Clorox Of Puerto Rico. The notice reports an infection risk. Do not use the product and dispose of it as directed. Published 2026-09-03. Models: CLEANERS/CLEANING PRODUCTS." https://recallscope.com/us/recall/scented-mistolin-dilutable-cleaners-and-lestoil-heavy-duty-multi-purpose-cleaners-sold-in-puerto-rico-and-the-u-s-virgin-islands-cpsc-10940 (last accessed on September 15, 2026).

finally acknowledging the Defect, Defendant has still failed to provide consumers, including Plaintiffs and Class Members, with any meaningful remedy.

16. Had Plaintiffs and Class Members known about the Defect, they would not have purchased the Products.

17. Plaintiffs and all reasonable consumers trusted that Defendant's Products were safe to use as intended. But the Recall proves they are not.

18. Defendant's Recall is inadequate and fails to provide purchasers with any adequate monetary relief.

19. Plaintiffs' economic injury occurred immediately upon purchase because Plaintiffs paid for products represented as safe household cleaners for ordinary residential use but containing an undisclosed latent pathogenic hazard.

20. Had Plaintiffs known of the Defect at the point of purchase, they would have purchased competing household cleaners or paid substantially less.

21. The Defect substantially reduced the market value of the Products, which were priced at a premium on the day of purchase.

22. Plaintiffs, on behalf of themselves and the Class, seek damages and all other relief available at law and in equity, including punitive damages for Defendant's misconduct. Plaintiffs also seek class-wide injunctive relief, including: (i) a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Products, including Spanish-language outreach in Puerto Rico; (ii) the implementation of a corrective advertising campaign to alert consumers to the dangers of the Defect; (iii) an order requiring Defendant to implement and maintain adequate preservative-efficacy, environmental-monitoring, and finished-product microbial testing for its scented cleaners; (iv) an offer to replace the Products with non-defective and safe products; and/or (v) a full refund of the purchase price.

23. This action seeks to hold Defendant accountable for its conscious decision to sell a dangerous product, its concealment of the known hazard associated with the Defect, and its insufficient recall remedy.

## PARTIES

***Plaintiff Carolina Rivera Toro***

24. At all relevant times, Plaintiff Carolina Rivera Toro was and is a resident and citizen of Puerto Rico, residing in Las Piedras, who purchased one or more Recalled Products. Plaintiff was unaware of the serious safety hazard associated with the Product's Defect.

25. Between May and June 2026, Plaintiff purchased scented Mistolín cleaners such as Mistolín Solo Para Tí, bearing code PR0125260PR-1, and Mistolín Flores de Primavera, bearing code PR0126049PR-1, in Supermercados Econo, each in the 64-fluid-ounce (1.8L) size. Each of these date codes begins with the prefix "PR01" and carries a five-digit code (26159, 26014, and 26056) within the range of 25091 through 26168 identified in the September 3, 2026, recall. Plaintiff also purchased and used other bottles of the Recalled Products during the Class Period that she consumed in the ordinary course of cleaning her home and no longer possesses.

26. Plaintiff reviewed the product packaging and label before purchasing the Product. Those materials represented that the Product was intended for ordinary residential household use and was suitable for such use, bore the Clorox diamond trademark, displayed the words "inspired by the power of Clorox", and promised "effective" cleaning of "multiple surfaces" was free of



infectious bacteria and safe to spray, pour, and breathe in her home Plaintiff reasonably understood those representations to mean the Product could be safely used in the ordinary manner intended by Defendant. Photographs of Plaintiff's Products and their date codes are reproduced below:

*Mistolín Flores de Primavera, bearing code PR0126049PR-1*




*Mistolín Sólo Para Tí, bearing code PR0125260PR-1*

27. Plaintiff used the Products as instructed for their intended residential household purposes.

28. Plaintiff expected that the Products could be safely used to clean surfaces throughout the home, as directed by Defendant.

29. Plaintiff would not have purchased or used the Products if she had known about the Defect and that the Products were unsafe to use.

***Plaintiff Stephanie Barbosa***

30. At all relevant times, Plaintiff Stephanie Barbosa was and is a resident and citizen of Puerto Rico, residing in Bayamon, Puerto Rico, who purchased one or more Recalled

Products. Plaintiff was unaware of the serious safety hazard associated with the ’Product’s Defect.

31. On or around June 2026, Plaintiff purchased scented Mistolín cleaners such as Mistolín Fresco Despertar, bearing code PR0126103PR-1, and Mistolín Alegra tu Día, bearing code PR0125232PR-1, in Supermercados Selectos, each in the 28-fluid-ounce (828 mL) size. Each of these date codes begins with the prefix “PR01” and carries a five-digit code (26159, 26014, and 26056) within the range of 25091 through 26168, identified in the September 3, 2026, recall[6]. Plaintiff also purchased and used other bottles of the Recalled Products during the Class Period that she consumed in the ordinary course of cleaning her home and no longer possesses.

32. Plaintiff reviewed the product packaging and label before purchasing the Product. Those materials represented that the Product was intended for ordinary residential household use and was suitable for such use, bore the Clorox diamond trademark, displayed the words “inspired by the power of Clorox”, and promised “effective” cleaning of “multiple surfaces” was free of infectious bacteria and safe to spray, pour, and breathe in her home.” Plaintiff reasonably understood those representations to mean the Product could be safely used in the ordinary manner intended by Defendant. Photographs of Plaintiff’s Products and their date codes are reproduced below:




[6] *See* https://www.cpsc.gov/Recalls/2026/Clorox-Puerto-Rico-Recalls-6-Million-Scented-Mistolin-and-Lestoil-Multi-Purpose-Cleaners-Due-to-Risk-of-Exposure-to-Bacteria (last accessed on September 15, 2026).

*Mistolin Fresco Despertar bearing code PR0126103PR-1*




*Mistolin Alegra tu dia bearing code PR0125232PR-1*

33. Plaintiff used the Products as instructed for their intended residential household purposes.

34. Plaintiff expected that the Products could be safely used to clean surfaces throughout the home, as directed by Defendant.

35. Plaintiff would not have purchased or used the Products if she had known about the Defect and that the Products were unsafe to use.

***Defendant The Clorox Company***

36. Defendant The Clorox Company is a Delaware corporation with its headquarters and principal place of business at 1221 Broadway, Oakland, California 94612. According to information and belief, Defendant, together with its wholly owned subsidiaries, is involved in the design, formulation, manufacturing, quality control, marketing, sale, and distribution of the recalled Products. Defendant is one of the largest manufacturers of household cleaning products in the world.

37. Defendant manufactures the Products in Puerto Rico through a wholly owned subsidiary, Clorox Manufacturing Company of Puerto Rico, Inc. ("Clorox Puerto Rico"), at a plant in Barrio Río Cañas, Caguas, Puerto Rico. Defendant owns and controls the Mistolin and Lestoil brands; places its own Clorox trademark on every bottle; sets the formulations, preservative systems, microbiological specifications, and quality-control standards under which the Products are made; controls the labeling and marketing of the Products; and made the decisions concerning the reporting and recall of the Products from its Oakland headquarters.

38. Plaintiffs reserve the right to amend the complaint to include any additional responsible parties or entities as the evidence or information may arise throughout discovery.

## JURISDICTION AND VENUE

39. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act because: (1) there are 100 or more putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is diversity because Plaintiffs and at Defendant are citizens of different states.

40. This Court has personal jurisdiction over Defendant because Defendant is at home in California, its principal place of business and corporate headquarters are in Oakland, California, and it does substantial business in California and within this District, receives substantial compensation and profits from the marketing, distribution, and sale of Products, and has engaged in the unlawful practices described in this Complaint. The conduct giving rise to Plaintiffs' claims, including the decisions concerning the formulation, quality control, labeling, marketing, safety reporting, and recall of the Products, emanated from Defendant's California headquarters.

41. Under 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, as Defendant regularly transacts business in this District. Defendant has intentionally availed itself of the laws and markets within this District. Plaintiffs also resides in this District.

42. **Divisional Assignment**: Pursuant to Civil Local Rules 3-2(c) and 3-2(e), assignment to the San Francisco Division or the Oakland Division is proper because a substantial part of the events giving rise to the claims occurred in Alameda County, where Defendant maintains its principal place of business.

## COMMON FACTUAL ALLEGATIONS

### The Recalled Products

43. The Recalled Products are scented, liquid, multi-purpose household cleaners sold under two Clorox-owned brands, Mistolin and Lestoil, in bottles of 28, 40, 64, and 128 fluid ounces.[7]

44. The Mistolin Products are dilutable cleaners marketed for use throughout the home and sold in nine fragrances: Alegra tu Día, Espíritu Play, Flores de Primavera, Fresco Despertar, Frescura de Lavanda, Frescura Tropical, Manzana y Canela, Pino y Especias, and Sólo para Ti. The Lestoil Products are marketed as heavy-duty multi-purpose cleaners and were sold in four fragrances: Energía del Yunque, Fuerza de Lavanda Tropical, Intenso Limón Boricua, and Olas de Rincón.[8]

45. The Recalled Products bear date codes printed on the bottle beginning with the prefix "PR01" followed by five digits from 25091 through 26168, corresponding to production dates from April 1, 2025, through June 17, 2026.[9]

46. The Products were sold at Walmart, Sam's Club, Costco, Supermercados Econo, Supermercados Selectos, and other major retailers in Puerto Rico and the U.S. Virgin Islands for approximately $1.40 to $8.00 per bottle, depending on size. Approximately 6.3 million units of the Recalled Products were sold.[10]

47. Mistolin and Lestoil are ubiquitous in Puerto Rico. Defendant has manufactured Lestoil and Mistolin in Puerto Rico for decades, produces approximately 18 million bottles a

---

[7] *Clorox Puerto Rico Recalls 6 Million Scented Mistolin and Lestoil Multi-Purpose Cleaners Due to Risk of Exposure to Bacteria, supra*.
[8] *Id.*
[9] *Id.*
[10] *Id.*

year at its Caguas plant, and promotes the brands as "Hecho en Puerto Rico."[11] For many Puerto Rican households, Mistolin is the default floor and multi-surface cleaner, purchased on a recurring basis and used in the kitchen, bathrooms, and living areas of the home.

48. Every bottle of the Products carries the Clorox name and trademark. The front label of each Mistolin Product displays the Clorox diamond logo beside the words "inspirado por el poder de CLOROX" ("inspired by the power of Clorox."). Defendant thereby holds the Products out to consumers as its own, trades on the reputation of the Clorox brand for effective and safe cleaning and invites consumers to attribute to the Products the quality they associate with Clorox.

49. The labels make affirmative representations about what the Products are and what they do. They describe the Products as a "Deodorizing Cleaner" ("Limpiador Aromatizante Desodorizante"), promise "Limpieza Efectiva y Fácil" ("Effective and Easy Cleaning"), instruct consumers to use the Products "en Múltiples Superficies" ("on Multiple Surfaces"), and promote "Fragancia Intensa + Duradera" ("Intense + Long-Lasting Fragrance") made with "Aceites Esenciales" ("Essential Oils"). The only hazard disclosed on the front label is eye irritation.

50. Defendant markets the Products by reference to their fragrance and to the atmosphere they create in the home. Defendant's official Mistolin website, copyrighted to The Clorox Company, invites consumers to "fill your home with joy with Mistolin" ("Llena tu casa de alegría con Mistolin") and tells them that "what you breathe in your home is what lives in your home" ("Lo que se respira en tu casa, se vive en tu casa").[12] Defendant's marketing thus expressly invites consumers to breathe the Products' scents and vapors as part of the experience of a clean home.

51. Nothing on the Products' labels, on Defendant's websites, or in any Defendant advertising disclosed that the Products could contain *Pseudomonas aeruginosa* or any other

[11] Asociación Hecho en Puerto Rico, *Clorox®, Lestoil® y Mistolín® celebran hechos en Puerto Rico hace 40 años*, https://asociacion.hechoen.pr/noticias/clorox-lestoil-y-mistolin-celebran-hechos-en-puerto-rico-hace-40-anos/ (last accessed September 14, 2026).

[12] Mistolin® Puerto Rico, https://puerto-rico.mistolin.co/ (last accessed September 14, 2026) ("© Copyright 2025 The Clorox Company, Inc.") (the "Mistolin Puerto Rico Website").

infectious bacteria; that Defendant's scented cleaner formulations had previously proven vulnerable to that contamination; or that Defendant had paid a civil penalty for failing to report that prior contamination to the CPSC.

***Pseudomonas aeruginosa***

52. *Pseudomonas aeruginosa* is an opportunistic bacterial pathogen found in soil and water. According to the Centers for Disease Control and Prevention ("CDC"), it is the species of Pseudomonas that most often causes infections in humans, and it can infect the blood, lungs (pneumonia), urinary tract, eyes, and open wounds, including surgical wounds and burns.[13] The CDC classifies multidrug-resistant *Pseudomonas aeruginosa* as a "serious" antibiotic-resistance threat and estimates that in 2017 it caused approximately 32,600 infections among hospitalized patients and 2,700 deaths in the United States. Some strains are resistant to nearly all available antibiotics, including carbapenems.[14]

53. Those most at risk from exposure include people with weakened immune systems, such as cancer patients, transplant recipients, people living with HIV, and the elderly, and people who use external medical devices such as catheters, ventilators, feeding tubes, and dialysis equipment.[15] Such individuals live in ordinary households, not only in hospitals, and many of them, or their caregivers, purchased and used the Products to clean the homes in which they live.

54. *Pseudomonas aeruginosa* thrives in moist environments and readily forms biofilms in tanks, pipes, and containers. It is a well-recognized contaminant of water-based consumer products, including cleaners, cosmetics, and personal-care products, when a product's preservative system fails or when manufacturing equipment and water systems are not adequately controlled and sanitized. Because the organism can survive and even multiply in products that consumers assume are inhospitable to bacteria, manufacturers of water-based

[13] Centers for Disease Control and Prevention, *About Pseudomonas aeruginosa*, https://www.cdc.gov/pseudomonas-aeruginosa/about/index.html (last accessed September 14, 2026).
[14] Centers for Disease Control and Prevention, Antibiotic Resistance Threats in the United States, 2019: Multidrug-Resistant Pseudomonas aeruginosa, https://www.cdc.gov/antimicrobial-resistance/media/pdfs/pseudomonas-aeruginosa-508.pdf (last accessed September 14, 2026).
[15] *About Pseudomonas aeruginosa*, *supra.*

household products must design formulations with validated preservative systems, conduct preservative-efficacy (challenge) testing, monitor water systems and storage tanks, and test finished products for microbial contamination before release.

55. A liquid cleaner contaminated with *Pseudomonas aeruginosa* does not merely fail to clean; it actively distributes a pathogen across the surfaces of the home, countertops, floors, bathrooms, and kitchens, and, when sprayed or poured, into the air. As the CPSC warned in the Recall Notice, the Products present a risk of serious infection to immunocompromised individuals and those with external medical devices through inhalation, contact with the eyes, or contact with breaks in the skin.[16]

56. A household cleaner that may contain an infectious pathogen is unfit for its ordinary purpose. It has no lawful market value, cannot safely be used as directed, and must be discarded. Reasonable consumers do not pay for such a product at any price.

**Defendant Owns, Controls, and Is Responsible for the Products.**

57. Defendant is the parent of Clorox Manufacturing Company of Puerto Rico, Inc. ("Clorox Puerto Rico") and owns 100% of its stock. Defendant reports the results of Clorox Puerto Rico's operations in Defendant's consolidated financial statements, and the revenue from the sale of the Products flows to Defendant.[17]

58. Defendant owns the CLOROX trademark that appears on every bottle of the Products, and it owns the MISTOLIN and LESTOIL trademarks and trade dress under which the products are sold. Defendant tells its shareholders in its annual reports that its "brand names and trademarks are highly important to its business," and that it "vigorously protects its trademarks."[18] Defendant publishes the Mistolin logo on its own corporate website as one of its

---

[16] *Clorox Puerto Rico Recalls 6 Million Scented Mistolin and Lestoil Multi-Purpose Cleaners Due to Risk of Exposure to Bacteria, supra.*

[17] The Clorox Company, Annual Report (Form 10-K) for the fiscal year ended June 30, 2025, https://www.sec.gov/Archives/edgar/data/21076/000002107625000039/clx-20250630.htm (last accessed September 14, 2026) (the "2025 Form 10-K").

[18] *2025 Form 10-K, supra.*

brand assets,[19] and the official Mistolin consumer website for Puerto Rico, like the Clorox Puerto Rico website and the Recall Website, is copyrighted to The Clorox Company.[20]

59. By placing its own CLOROX mark on the Products and declaring them "inspired by the power of Clorox," Defendant puts the Products out as its own. A company that puts out as its own a product manufactured by another is subject to the same liability as if it were the manufacturer.

60. Defendant exercises control over the nature and quality of the Products sold under the CLOROX, MISTOLIN, and LESTOIL marks, and it is responsible for that quality to the consumers who rely on those marks.

61. That control is exercised through Defendant's corporate research and development, product supply, quality assurance, regulatory affairs, and brand management organizations, which establish and control the formulations of the Products, including their fragrance and preservative systems; the microbiological specifications and testing protocols that apply to raw materials, process water, storage tanks, and finished product; the good-manufacturing-practice, sanitation, and quality-control standards under which the Caguas plant operates; the design and content of the Products' labels; and the marketing of the Products. Clorox Puerto Rico manufactures the Products to Defendant's specifications, and the Caguas plant is part of Defendant's integrated product-supply network.[21]

62. Defendant publishes the Safety Data Sheets for the Mistolin Products on its own corporate website, thecloroxcompany.com, alongside the Safety Data Sheets for its other brands, identifying the Products as Clorox products for regulatory and safety purposes.[22]

63. Defendant also controls product-safety reporting and recall decisions for the Products. Under Section 15(b) of the Consumer Product Safety Act, 15 U.S.C. § 2064(b), and

---

[19] The Clorox Company, *Logo: Mistolin*, https://www.thecloroxcompany.com/mistolin_large/ (last accessed September 14, 2026).

[20] *Mistolin Puerto Rico Website, supra* n. 10; Mistolin® and Lestoil® Recall, https://www.mistolinrecall.com/en/ (last accessed September 14, 2026) ("© Copyright 2026 The Clorox Company, Inc.") (the "Recall Website").

[21] Asociación Hecho en Puerto Rico, *supra.*

[22] The Clorox Company, *Safety Data Sheets: Mistolín® Deodorizing Cleaner*, https://www.thecloroxcompany.com/wp-content/uploads/2023/02/USA002139-Mistolin-Deodorizing-Cleaner-Frescura-Citrica_0.pdf (last accessed September 14, 2026).

the CPSC's implementing regulations, 16 C.F.R. §§ 1115.12–1115.14, a manufacturer that obtains information reasonably supporting the conclusion that a product contains a defect that could create a substantial product hazard or creates an unreasonable risk of serious injury or death, must immediately report that information to the CPSC. Under the January 2026 settlement agreement resolving the CPSC's Pine-Sol charges, described below, Defendant, the parent company, agreed to maintain a compliance program designed to ensure compliance with the Consumer Product Safety Act, to maintain internal controls and procedures for that purpose, and to submit annual compliance reports to the CPSC.[23] That compliance program governs the Products and the Caguas plant, and the decisions concerning whether and when to report the contamination of the Products to the CPSC and to recall the Products were made by Defendant at its Oakland headquarters. The Recall Website through which Defendant administers the Recall is itself copyrighted to The Clorox Company.[24]

64. Defendant's participation in the enterprise that placed the Products in the stream of commerce, its ownership of the Products' brands, its placement of its own trademark on every bottle, its control over their formulation, quality, labeling, and marketing, its receipt of the revenue from their sale, and its control over safety reporting and recall, makes Defendant responsible for the Products as if it had manufactured and sold them itself. Consumers in Puerto Rico and the U.S. Virgin Islands who purchased Mistolin and Lestoil understood them to be, and relied on them as, Clorox products.

**<u>Defendant Knew Its Scented Cleaners Were Vulnerable to *Pseudomonas* Contamination and Had a Duty to Disclose</u>**

65. Long before the Recall, Defendant had confronted *Pseudomonas aeruginosa* contamination in its own scented cleaner line.

66. In early 2019, Defendant's own microbiologists issued a written report identifying "[a possible] Pseudomonad" in storage tanks and in a finished Pine-Sol product at Defendant's

[23] *Penalty Release, supra.*
[24] *Recall Website, supra.*

Forest Park, in their Georgia manufacturing facility. Defendant later received reports of cloudiness in Pine-Sol products at retail and from distributors in various locations (a visible sign of microbial growth).[25] Defendant did not report this information to the CPSC as the law required, and instead continued to manufacture and sell scented Pine-Sol products for years.[26]

67. On October 25, 2022, Defendant and the CPSC announced the recall of approximately 37 million bottles of Pine-Sol Scented Multi-Surface Cleaners, CloroxPro Pine-Sol All Purpose Cleaners, and Clorox Professional Pine-Sol Lemon Fresh Cleaners manufactured between January 2021 and September 2022, because the products might have "contain[ed] bacteria, including *Pseudomonas aureginosa*," and posed a risk of serious infection to "people with weakened immune systems or external medical devices." The recall notice identified the recalling firm as The Clorox Company of Oakland, California. As here, only the scented products were recalled; Original Pine-Sol was excluded.[27]

68. Consumers sued. In *Charles v. The Clorox Company*, No. 4:22-cv-06855 (N.D. Cal.), and in related actions in the Southern District of New York, purchasers alleged that Defendant had sold Pine-Sol products contaminated with *Pseudomonas aeruginosa* without disclosure. Defendant resolved those actions through a $5.65 million class settlement.[28]

69. The CPSC then pursued Defendant for its failure to report. On January 27, 2026, the CPSC announced that Defendant had agreed to pay a $14.15 million civil penalty to resolve the Commission's charge that Defendant "knowingly failed to immediately report to CPSC, as required by law, that its Pine-Sol Scented Multi-Surface Cleaning Products contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death to consumers." In addition to the penalty, Defendant agreed to maintain enhanced internal controls and compliance procedures and to submit annual compliance reports to the CPSC.[29]

---

[25] *Penalty Release, supra.*
[26] *Id.*
[27] *Pine-Sol Recall Notice, supra.*
[28] *See* Class Action Settlement Agreement and Release, *Swetz v. The Clorox Co.*, No. 7:22-cv-09374-PMH (S.D.N.Y.), https://violationtracker.goodjobsfirst.org/archive/prod118.pdf (last accessed September 14, 2026) (resolving *Swetz*; *Charles v. The Clorox Co.*, No. 4:22-cv-06855-HSG (N.D. Cal.); and *Kossel v. The Clorox Co.*, No. 7:22-cv-10450-PMH (S.D.N.Y.)).
[29] *Penalty Release, supra.*

70. The Pine-Sol experience gave Defendant actual knowledge of each of the following facts before and throughout the period in which the Products were manufactured and sold: (a) that Defendant's scented, water-based multi-surface cleaner formulations are susceptible to contamination by Pseudomonas aeruginosa; (b) that such contamination can originate in and persist within Defendant's storage tanks, water systems, and manufacturing equipment; (c) that the contamination can go undetected for extended periods absent rigorous preservative-efficacy testing, environmental monitoring, and finished-product microbial testing; (d) that cloudiness or other changes in product appearance are a warning sign of microbial growth; (e) that a contaminated cleaner poses a risk of serious infection to immunocompromised consumers and those with external medical devices; and (f) that the failure to report and disclose such contamination promptly exposes consumers to harm and exposes Defendant to regulatory penalties.

71. The Products at issue here share the relevant characteristics of the recalled Pine-Sol products. Both are scented, water-based, multi-surface liquid cleaners. In both cases only the scented variants were contaminated, while the unscented formulation was not, demonstrating that the fragrance and preservative systems Defendant selected for its scented cleaners are inadequate to prevent Pseudomonas growth, and that Defendant failed to correct that inadequacy across its scented cleaner portfolio after the Pine-Sol recall. The recurrence of the same organism in the same category of product at two different Clorox plants (Forest Park, Georgia in 2019–2022 and Caguas, Puerto Rico in 2025–2026) demonstrates that the vulnerability lies in the formulation and microbial-control standards that Defendant sets for its scented cleaners company-wide, not in the practices of any single plant.

72. The problem was not a single-lot anomaly. The Recall covers every scented Mistolin and Lestoil product manufactured over a fifteen-month period, from April 1, 2025, through June 17, 2026.[30] A contamination risk of that duration and scope reflects a systemic failure of formulation, manufacturing controls, and quality testing, not an isolated event. Had

[30] *Clorox Puerto Rico Recalls 6 Million Scented Mistolin and Lestoil Multi-Purpose Cleaners Due to Risk of Exposure to Bacteria, supra.*

Defendant been conducting the preservative-efficacy testing, environmental monitoring, and finished-product microbial testing that its own Pine-Sol experience demonstrated were necessary, the problem would have been detected at or near its inception in the spring of 2025, not more than a year later.

73. The timing of the Recall further shows that Defendant knew of the contamination and concealed it. The Recall covers no Product manufactured after June 17, 2026 (date code 26168).[31] Yet Defendant did not announce the Recall until September 3, 2026, more than eleven weeks later. During those weeks, Defendant allowed the Products already manufactured to remain on store shelves in Puerto Rico and the U.S. Virgin Islands, where consumers continued to purchase and use them, unaware that the Products could contain a pathogen.

74. Moreover, Defendant's annual reports acknowledge that Defendant's products "have, in the past, and could, in the future, face withdrawal, recall or other quality issues."[32] Defendant thus recognized, at the highest levels of the company, that product contamination was a known and recurring risk of its business, one for which it was responsible and which it was obligated to manage.

75. Defendant had, and continues to have, a duty to disclose to consumers that the Products could be contaminated with *Pseudomonas aeruginosa* because: (a) the contamination poses an unreasonable safety hazard; (b) the contamination goes to the central function of the Products, which is to clean and not to contaminate the home; (c) Defendant had exclusive knowledge of material facts that were not known to or reasonably discoverable by consumers; (d) Defendant actively concealed those facts by continuing to sell the Products without disclosure; and (e) Defendant made partial representations about the Products, placing the Clorox trademark on each bottle, describing the Products as a "Deodorizing Cleaner" that delivers "Effective and Easy Cleaning" on "Multiple Surfaces," and promoting fragrances that invite consumers to breathe them in, while omitting the facts necessary to make those representations not misleading.

---

[31] *Id.*

[32] *2025 Form 10-K, supra.*

76. A consumer cannot detect *Pseudomonas aeruginosa* in a bottle of cleaner. The organism is invisible in normal concentrations; the Products are colored and heavily fragranced, masking the appearance and odor changes that can accompany microbial growth; and no reasonable consumer has the ability to conduct microbial testing of a household cleaner before use. The information was uniquely within Defendant's possession.

77. The omitted facts were material. A reasonable consumer would consider it important, in deciding whether and at what price to purchase a household cleaner, that the cleaner may contain an infectious pathogen capable of causing pneumonia, bloodstream infections, and death in vulnerable people; that it may spread that pathogen across the surfaces of the home; and that the manufacturer had experienced the same contamination in the same category of product only a few years earlier. Safety hazards of this kind are material as a matter of law and common sense.

78. Plaintiffs and Class Members reasonably relied on Defendant's representations and omissions. They purchased the Products in retail stores where the Products were presented on the shelf as ordinary household cleaners bearing the Clorox trademark, and they reasonably assumed, because nothing told them otherwise, that the Products were free of infectious bacteria. Had the truth been disclosed on the label, on the shelf, or in Defendant's marketing, Plaintiffs and Class Members would have seen the disclosure and would not have purchased the Products, or would have paid less for them.

79. Plaintiffs' and Class Members' economic injury does not depend on whether any bottle would test positive for *Pseudomonas aeruginosa*. Every unit of the Recalled Products was manufactured under the conditions that Defendant has determined may have introduced the organism; Defendant cannot assure that any unit is free of it; Defendant has instructed every consumer to stop using and discard every unit; and no unit may lawfully be sold. Each unit of the Recalled Products was therefore unfit for its intended use, and worthless, from the moment it was sold, and every Class Member was injured in the same way and by the same uniform condition.

**The Recall Does Not Make Plaintiffs or the Class Whole.**

80. On September 3, 2026, the CPSC announced Recall No. 26-741. The Recall is administered through the Recall Website, mistolinrecall.com, which is copyrighted by The Clorox Company, and through a third-party claims administrator. Consumers are told to "stop using [the Product] immediately," to "dispose of the product in its container with household trash," and, if they experience "a health-related issue," to "seek immediate medical attention." To obtain a refund, a consumer must complete an online form or call a toll-free number and must supply a photograph of the UPC code on the bottle so that Defendant can "verify the UPC code." If the claim is accepted, the consumer "can expect to receive a check covering product costs and approximate tax" "within approximately 4–6 weeks."[33] Those terms, dictated unilaterally by Defendant, fall far short of making consumers whole, and they do not extinguish the claims asserted in this Complaint.

81. First, the program excludes most of the Products that were sold. A household cleaner is a consumable: it is poured and sprayed until the bottle is empty, and the empty bottle is thrown away. The Products were sold for seventeen months before the Recall, and the great majority of the 6.3 million units sold have already been used up and discarded. Yet Defendant conditions any refund on a photograph of the UPC code on the bottle. A consumer who no longer has the bottle receives nothing, no matter how many bottles they bought and used.

82. Second, the amount of the refund is set by Defendant, not by what the consumer paid. Defendant promises a check "covering product costs and approximate tax," in an amount Defendant determines. The Products were sold at prices ranging from approximately $1.40 to $8.00, at different retailers, in different sizes, and at different times; nothing in the program commits Defendant to pay the actual price a consumer paid, and the program does not require Defendant to disclose how it calculates "product costs." Nor does the program pay interest on money that Defendant has held for as long as seventeen months or compensate consumers for the time required to photograph bottles, complete forms, and wait four to six weeks for a check.

---

[33] *Recall Website, supra.*

83. Third, and critically, the program offers nothing for remediation and cleaning. Defendant's own instructions confirm that consumers have been exposed: it tells them to stop using the Products immediately and to seek medical attention if they experience a health-related issue. Consumers who followed the label's instruction to use the Products "on Multiple Surfaces" sprayed and poured a cleaner that may contain *Pseudomonas aeruginosa* across the floors, countertops, sinks, tubs, and toilets of their homes, and onto the mops, sponges, cloths, and buckets they used to apply it. Reasonable consumers who learn that they have done so must now disinfect those surfaces with a product they can trust, discard and replace the mops, sponges, and cloths that were saturated with the contaminated Products, and purchase replacement cleaning products to do so. Many will incur the cost of professional cleaning, particularly households that include an immunocompromised family member, an infant, an elderly relative, or a person who uses a catheter, feeding tube, or other medical device, the very people the Recall identifies as at risk. Defendant's program does not reimburse a single dollar of these costs.

84. Fourth, the program shifts the burden and risk of disposal to consumers. Defendant instructs consumers to throw a product that may contain an infectious pathogen into their household trash, without any guidance on protective measures, without offering to collect the Products, and without compensating consumers for handling them. Consumers who have already emptied the Products down their drains, as cleaners are ordinarily used, receive no guidance at all.

85. Fifth, the program depends on consumers learning of it. The Recall was announced through a CPSC press release and a website. Defendant has not provided point-of-sale notice at the Puerto Rico and U.S. Virgin Islands retailers where the Products were sold, has not directly notified consumers, and has not undertaken the broad, sustained, Spanish-language outreach that would be required to reach the hundreds of thousands of households that purchased the Products. Consumers who do not learn of the Recall will continue to use contaminated Products in their homes and will never receive a refund.

86. Sixth, the program provides none of the relief the law provides. It pays no statutory damages, no punitive damages, and no attorneys' fees; it does not disgorge the profits Defendant earned from seventeen months of sales; it does not compensate Class Members for the difference between what they paid and what they received; and it does nothing to prevent a recurrence. The program imposes no obligation on Defendant to correct the formulation, testing, and quality-control failures that produced this Recall and the Pine-Sol recall before it, and Defendant has not disclosed to consumers what caused the contamination or what, if anything, it has changed.

87. Finally, the program is a voluntary undertaking that Defendant may modify or terminate at any time, offered only after Plaintiffs' and Class Members' injuries were complete. It does not moot their claims, and it does not deprive Plaintiffs of standing to seek the complete relief to which they and the Class are entitled.

**Discovery Rule and Tolling.**

88. Plaintiffs and Class Members could not reasonably have discovered the contamination of the Products, or Defendant's omissions concerning it, until the Recall was announced on September 3, 2026. Any applicable statutes of limitations have accordingly been tolled by the discovery rule and by Defendant's fraudulent concealment, as more fully alleged in the Tolling and Estoppel section below, and Defendant is estopped from relying on any limitations defense.

## CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this action on behalf of themselves and the following Classes (the "Class") under Rule 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure:

> **Nationwide Class:** All persons who purchased one or more of the Recalled Products in Puerto Rico or the U.S. Virgin Islands for personal use or household use and not for resale during the fullest period allowed by law ("Nationwide Class").
>
> **Puerto Rico Sub-Class:** All persons in Puerto Rico who purchased the Products for personal use or household use and not for resale during the fullest period provided by law ("Puerto Rico Sub-Class" and together with the Nationwide Class "Class Members" or "Members of the Class").

90. Excluded from the Class are: (a) any officers, directors or employees, or immediate family members of the officers, directors, or employees of Defendant or any entity in which Defendant has a controlling interest; (b) any legal counsel or employee of legal counsel for the Defendant; (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members; and (d) any person who has previously settled claims related to the Defect with Defendant.

91. Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

92. **Numerosity**. Class Members are numerous and geographically dispersed, making joinder of all Class Members impracticable. While the exact number of Class Members remains currently unknown, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Class may be ascertained from Defendant's books and records, as well as third-party retailers. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

93. **Predominance** of Common Questions of Law and Fact. Common questions of law and fact exist for all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a. Whether the Products contained the Defect alleged herein;

b. Whether Defendant knew or should have known of the Defect;

c. Whether Defendant had to disclose the Defect to consumers;

d. Whether Defendant's representations and omissions were misleading or deceptive;

e. Whether Defendant's conduct was unfair or illegal;

f. Whether Defendant's conduct violated the California consumer protection statutes alleged herein;

g. Whether Defendant breached its implied warranties;

h. Whether Class Members suffered economic injury;

i. Whether Defendant's conduct violates public policy;

j. Whether the facts Clorox omitted were material to a reasonable consumer;

k. Whether Defendant was unjustly enriched at the expense of Plaintiffs and members of the putative Class in connection with selling the Defective Products; and

l. Whether Plaintiffs and Class Members are entitled to restitution, damages, and injunctive relief, and the proper measure of that relief.;

94. **Typicality.** Plaintiffs' claims are typical of those of the absent Class Members in that Plaintiffs and the Class Members each purchased and used the Products, and each sustained damages arising from Defendant's wrongful conduct, as disclosed herein. Plaintiffs share the aforementioned facts and legal claims or questions with the putative Class Members. Plaintiffs and all members of the putative Class have been similarly affected by Defendant's common misconduct alleged herein. Plaintiffs and all members of the putative Class sustained monetary and economic injuries, including—but not limited to—ascertainable losses resulting from Defendant's deceptive omissions concerning the Products' safety and ability, as well as the proposed repair remedy's ability to function as intended.

95. **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Class. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including the issues that arise in this type of consumer protection litigation. Further, Plaintiffs and counsel are committed to the vigorous prosecution of this action. Plaintiffs have no conflicts of interest or interests adverse to those of the putative Class.

96. **Insufficiency of Separate Actions**. Absent a class action, Plaintiffs and Members of the Class will continue to suffer the harm described herein, for which they would have no remedy. Even if individual consumers could bring separate actions, the resulting multiplicity of

lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

97. **Superiority**. A class action is superior to any other available method for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual member of the putative Class does not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

b. Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Class;

d. Individual joinder of all members of the Class is impracticable;

e. Absent a Class, Plaintiffs and members of the putative Class will continue to suffer harm as a result of Defendant's unlawful conduct; and

f. This action presents no manageability concerns that would impede its treatment as a class action and, in fact, is the most appropriate and efficient method by which Plaintiffs and the members of the putative Class can obtain redress for the harm caused by Defendant's misconduct.

98. In the alternative, the Class may be certified for the following reasons:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication concerning individual members of the Class, which would establish incompatible standards of conduct for Defendant; and

b. Adjudications of claims of the individual members of the Class against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Class who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests.

## CAUSES OF ACTION

### COUNT I
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200 et seq.
### (On Behalf of the Plaintiffs and the Class)

99. Plaintiffs incorporate by reference and re-alleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

100. California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 et seq., prohibits any unlawful, unfair, or fraudulent business act or practice, as well as unfair, deceptive, untrue, or misleading advertising.

101. The UCL applies to Plaintiffs and Class Members because the challenged conduct originated in California. Defendant is headquartered in Oakland, California. Decisions about the Products' formulation, microbial-testing and quality control standards, labeling, marketing, reporting to CPS, and the timing and terms of the Recall were made, in whole or in part, at the headquarters.

102. Defendants engaged in unlawful, unfair, and fraudulent business practices by marketing, advertising, distributing, and selling the Products without disclosing the Defect: the Products contamination with or risk of contamination by, Pseudomonas aeruginosa, a bacterium that can cause serious infections through inhalation, contact with the eyes, or contact with broken skin.

***Fraudulent Business Practices***

103. Defendants' conduct constitutes a fraudulent business practice because the Products' labels presented them as Clorox-branded household cleaners suitable for use

throughout the home, promising “Effective and Easy Cleaning” on “Multiple Surfaces,” while omitting the Defect. Without disclosure of the Defect, those partial representations were likely to deceive reasonable consumers.

104. Defendant’s omissions and affirmative safety representations were material because reasonable consumers purchasing household cleaning products consider whether the products are safe and suitable for use throughout the home important in deciding whether to purchase the Products and how much to pay for them.

105. The omitted information was not known or reasonably knowable to Plaintiffs or reasonable consumers.

106. Defendants knew, or were reckless in not knowing, that reasonable consumers would rely upon Defendants’ safety-related representations and omissions when purchasing the Products.

107. Plaintiffs and Class Members reasonably relied upon Defendants' omissions and affirmative representations regarding the Products’ safety and suitability for ordinary residential use when purchasing the Products.

***Unfair Business Practices***

108. Defendants' conduct also constitutes an unfair business practice under the UCL.

109. Clorox’s conduct is unfair because it offends established public policy—including the policies embodied in the Consumer Product Safety Act and the CLRA—and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm to consumers from selling a pathogen-contaminated cleaner without disclosure vastly outweighs any utility of Clorox’s conduct, and consumers could not reasonably have avoided the injury because they had no means of detecting the contamination.

***Unlawful Business Practices***

110. Defendant’s conduct further constitutes an unlawful business practice because it violates, among other laws:

a. The California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.;

b. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.;

c. California Civil Code §§ 1572, 1573, 1709, and 1710;

d. Section 15(b) of the Consumer Product Safety Act, 5 U.S.C. § 2064(b);

e. 16 C.F.R. Part 1115, which required Clorox to immediately report the contamination of the Products to the CPSC; and

f. the Puerto Rico law prohibiting the sale of goods with hidden defects, as alleged below

***Economic Injury and Restitution***

111. Plaintiffs and Class Members suffered economic injury because they paid money for Products that were worth materially less than represented at the time of purchase due to the undisclosed Defect.

112. Plaintiffs' and Class Members' economic injury occurred at the time of purchase. The subsequent Recall did not create the injury; rather, it confirmed that the Products contained the Defect when originally sold.

113. Plaintiffs and Class Members lack an adequate remedy at law. The injunctive relief sought here—including an order requiring Clorox to disclose the contamination risk, to implement and maintain adequate preservative-efficacy, environmental-monitoring, and finished-product testing for its scented cleaners, and to conduct effective, Spanish-language recall outreach in Puerto Rico—cannot be obtained through an award of damages.

114. Restitution under the UCL is also measured differently from, and is not coextensive with, damages: the Court may award restitution of the money Class Members paid even if damages prove difficult to quantify, and the elements of a UCL claim differ from those of Plaintiffs' legal claims, so that Plaintiffs may prevail under the UCL even if their legal claims fail.

115. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent business practices, Plaintiffs and the Class Members lost money or property within the meaning of California Business and Professions Code § 17204.

116. Plaintiffs seek all equitable relief available under the UCL, including restitution and injunctive relief, on behalf of themselves and the Class, together with attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

117. Plaintiffs seek restitution under the UCL in the alternative and alleges that legal remedies alone are inadequate to fully compensate Plaintiffs and the Class Members or to prevent Defendants' ongoing unfair competition.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500 et seq.**
**(On Behalf of the Plaintiffs and the Class)**

118. Plaintiffs incorporate by reference and re-alleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

119. California's False Advertising Law ("FAL"), California Business and Professions Code §§ 17500 et seq., prohibits any person or entity from making or disseminating any statement concerning property or services that is untrue or misleading, and that is known, or by the exercise of reasonable care should be known, to be untrue or misleading.

120. In the course of marketing and selling the Products, Defendants disseminated uniform advertising about the Products from California where it developed and approved the Products' labels and consumer-facing marketing, including, Mistolin and Lestoil websites maintained under its name, through, among other things, product packaging, product labeling, instruction manuals, retail point-of-sale materials, online product listings, and Defendants' own websites.

121. Through these materials, Defendant represented that the Products were suitable for ordinary residential lawn  and could be safely used to clean multiple surfaces throughout the home.

122. On every bottle, Defendant presented the Products as Clorox-branded household cleaners for "Effective and Easy Cleaning" on "Multiple Surfaces," to be used throughout the home. Those statements were misleading because they conveyed that the Products were safe for their intended household use while omitting the Defect.

123. Defendant knew, or by the exercise of reasonable care should have known, that these representations and omissions were false and misleading because Defendants possessed information regarding the Defect before Plaintiffs and Class Members purchased the Products.

124. The omitted information was material because reasonable consumers would consider it important that a cleaner meant for kitchens, bathrooms, and floors may carry an infectious bacterium.

125. Plaintiffs reviewed and reasonably relied upon Defendants' advertising and promotional representations before purchasing the Products. Had Plaintiffs known the truth regarding the Defect, Plaintiffs would not have purchased the Products or would have paid substantially less for them.

126. Defendant's advertising and promotional practices were likely to deceive reasonable consumers acting reasonably under the circumstances.

127. Plaintiffs lack an adequate remedy at law for the reasons alleged in Count II and seek restitution and injunctive relief under Business and Professions Code § 17500, together with attorneys' fees and costs.

**COUNT III**
**Violation of California Consumers' Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750 et seq.**
**(On Behalf of the Plaintiffs and the Class)**

128. Plaintiffs incorporate by reference and re-allege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129. The California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750 et seq., prohibits unfair methods of competition and unfair or deceptive acts or

practices undertaken in transactions intended to result in, or that result in, the sale of goods to consumers.

130. The Products are "goods" within the meaning of California Civil Code § 1761(a).

131. Defendant is a "person" within the meaning of California Civil Code § 1761(c).

132. Plaintiffs and Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

133. Plaintiffs' purchase of the Products constitutes a "transaction" within the meaning of California Civil Code § 1761(e).

134. Defendant violated California Civil Code § 1770(a)(5) by representing that the Products possessed characteristics, uses, benefits, and qualities that they did not possess, including representing that the Clorox-branded cleaners provided "Effective and Easy Cleaning" on "Multiple Surfaces" throughout the home, when the Products contained the Defect.

135. Defendant violated California Civil Code § 1770(a)(7) by representing that the Products were of a particular standard, quality, and grade when, in fact, they contained an undisclosed safety defect that materially diminished their value and rendered them unsuitable for their represented use.

136. Defendant violated California Civil Code § 1770(a)(9) by advertising the Products as suitable and safe for their intended purpose while failing to disclose the defect known to Defendant.

137. Plaintiffs and Class Members relied on Defendant's representations and omissions. Had the Defect been disclosed, they would not have purchased the Products or would have paid less for them.

138. Plaintiffs and Class Members were unaware of the Defect and reasonably relied upon Defendant's affirmative safety representations and material omissions in deciding to purchase the Products.

139. Had Defendant disclosed the Defect, Plaintiffs and Class Members would not have purchased the Products or would have paid substantially less for them.

140. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and Class Members suffered harm and are threatened with continuing harm absent injunctive relief requiring Defendant to cease the deceptive practices alleged herein and to provide truthful disclosures concerning the Products.

141. Concurrently with the filing of this Complaint, Plaintiffs are serving Defendant with written notice pursuant to California Civil Code § 1782(a), identifying the particular violations of the CLRA alleged herein and demanding that Defendant correct, repair, replace, or otherwise rectify the unlawful practices described in this Complaint.

142. At this time, Plaintiffs seek only injunctive relief under California Civil Code §§ 1780(a)(2) and 1782(d), requiring Defendant to cease the deceptive practices alleged herein, to provide complete and accurate disclosures regarding the Products and Defect, and to take such other corrective action as the Court deems just and proper.

143. If Defendant fail to timely correct, repair, replace, or otherwise rectify the violations identified in Plaintiff's CLRA notice, Plaintiffs intend to amend this Complaint to seek all remedies available under California Civil Code § 1780, including damages.

## **COUNT IV**
## **Fraudulent Concealment**
## **(On Behalf of the Plaintiffs and the Class)**

144. Plaintiffs hereby repeat, reallege, and incorporate by reference all preceding paragraphs as though fully set forth herein.

145. Plaintiffs bring this claim under California law, which governs because Clorox's concealment emanated from California, and, in the alternative, under the law of Puerto Rico, including Article 1536 of the Puerto Rico Civil Code of 2020, which imposes liability for damage caused by fault or negligence, including intentional concealment.

146. Clorox knew, before and throughout the Class Period, that its scented cleaner formulations, including the Products, were vulnerable to contamination by *Pseudomonas aeruginosa* and that its manufacturing controls had previously failed to prevent that

contamination; and Clorox knew of the contamination risk in the Products themselves around May or June 2026, for the reasons alleged above. Clorox disclosed neither fact to consumers until September 3, 2026.

147. Defendant had a duty to disclose those facts to Plaintiffs and Class Members because the contamination poses an unreasonable safety hazard; because Clorox had exclusive knowledge of material facts not reasonably discoverable by consumers; because Clorox actively concealed those facts by continuing to sell the Products without disclosure; and because Clorox made partial representations about the Products that were misleading without the omitted facts.

148. Defendant intentionally concealed and failed to disclose those facts with the intent to induce Plaintiffs and Class Members to purchase the Products at the prices charged.

149. Plaintiffs and Class Members were unaware of the concealed facts and would not have purchased the Products, or would have paid less for them, had the facts been disclosed. They justifiably relied on Clorox's silence, because Clorox had the duty and the exclusive ability to disclose.

150. Accordingly, Defendant is liable to Plaintiffs and the Classes for damages in an amount to be proven at trial.

151. Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Classes; and to enrich itself. Its misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT V

**Breach of the Implied Warranty Against Hidden Defects[34]**
**Under the Puerto Rico Civil Code and, in the Alternative, Breach of the Implied Warranty of Merchantability, Cal. Com. Code § 2314**
**(On Behalf of the Plaintiffs and the Puerto Rico Subclass, in the alternative, the Class)**

152. Plaintiffs hereby repeat, reallege, and incorporate by reference all preceding paragraphs as though fully set forth herein.

[34] Known in Puerto Rico as *"Saneamiento por Vicios Ocultos."*

153. Under the Puerto Rico Civil Code of 2020, Act No. 55-2020, Articles 1261–1263 and 1267–1270, 31 L.P.R.A. §§ 9851–9853, 9871–9874 (formerly 31 L.P.R.A. §§ 3841–3847), a person who transfers a good for value answers for its hidden defects (*vicios redhibitorios*): a seller warrants the buyer against hidden defects in the thing sold that render it unfit for the use for which it is intended, or that diminish that use to such an extent that the buyer would not have acquired it, or would have paid a lower price, had the buyer known of the defect. The warranty is implied by law in every contract of sale and extends to the manufacturer that placed the product into the chain of distribution. Virgin Islands law provides a corresponding implied warranty of merchantability, 11A V.I.C. § 2-314, on behalf of Class Members who purchased in the U.S. Virgin Islands.

154. Clorox, as the owner of the Products' brands, the entity whose trademark appears on every bottle, and the entity that controlled their formulation, manufacture, quality, and sale, is a seller and manufacturer of the Products within the meaning of the warranty, and, in the alternative, Plaintiffs and SubClass Members are the intended beneficiaries of the warranties running from Clorox through its subsidiary and the retailers that sold the Products to consumers.

155. The Products contained a hidden defect at the time of sale: contamination with, or susceptibility to contamination by, *Pseudomonas aeruginosa*. The defect was unknown to Plaintiffs and SubClass Members; could not have been discovered by them through reasonable inspection; existed before the sale, having arisen in Clorox's formulation and manufacturing processes; and is so serious that it renders the Products entirely unfit for their intended use as household cleaners.

156. Clorox knew of the defect at the time of sale, for the reasons alleged above, and is therefore liable not only for the return of the purchase price but for all damages caused by the defect.

157. This action is timely. Plaintiffs Products were purchased within six months of the filing of this action. The defect was concealed and could not have been discovered until the recall was announced on September 3, 2026, and this action was filed within days of that

announcement. To the extent any limitations period applicable to this claim began to run before that date, it was tolled by Clorox's concealment of the defect and interrupted by Plaintiffs' extrajudicial demand on Clorox, served concurrently with this Complaint, and by Clorox's own recall program, which constitutes an ongoing effort by the seller to address the defect.

158. In the alternative, should the Court determine that California law governs, Clorox impliedly warranted under California Commercial Code § 2314 that the Products were merchantable—that they would pass without objection in the trade under the contract description, were fit for the ordinary purposes for which household cleaners are used, and were adequately labeled. The Products were not merchantable for the reasons alleged above. Plaintiffs and Class Members are in privity with Clorox or are intended third-party beneficiaries of Clorox's warranties to the retailers through which Clorox distributes the Products, and Clorox received notice of the breach through the recall, through the consumer complaints that prompted it, and through the CLRA notice described above.

159. As a direct and proximate result of Clorox's breach, Plaintiffs and Class Members have been damaged in an amount to be proven at trial, including the purchase price of the Products, the loss of their use, and the costs of disposal and remediation

**COUNT VI**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of Plaintiffs and the Nationwide Class or, in the alternative, the Puerto Rico Sub-Class)**

160. Plaintiffs hereby repeat, reallege, and incorporate by reference all preceding paragraphs as though fully set forth herein.

161. Plaintiffs plead this claim in the alternative to their claims at law, as permitted by Federal Rule of Civil Procedure 8(d), under California law and, in the alternative, under the Puerto Rico doctrine of unjust enrichment.

162. Plaintiffs and the Class Members conferred a benefit on Defendant by purchasing the Products—payments that Defendant knowingly accepted while aware of the product's defect and unfitness for its intended use.

163. Defendant either knew or should have known that the payments rendered by Plaintiffs and Class Members were given with the expectation that the Products would have the qualities, characteristics, and suitability for the use represented and warranted by the Defendant. As such, it would be inequitable for the Defendant to retain the benefit of the payments under these circumstances.

164. By its wrongful acts and omissions described herein, including selling the Products, which contained a Defect, the Defendant was unjustly enriched at the expense of Plaintiffs and the Class Members.

165. Defendant's wrongful conduct directly caused Plaintiffs' detriment and resulted in Defendant's unjust enrichment, as the benefit it received flowed directly from the misconduct alleged in this Complaint.

166. Defendant has unjustly profited from its unlawful, unfair, and deceptive conduct at the expense of Plaintiffs and the Class Members. It would be inequitable and contrary to principles of justice for the Defendant to retain the profits, benefits, and other compensation obtained through the sale of the Products, as such enrichment was directly tied to the misconduct alleged herein.

167. Defendant was unjustly enriched by retaining revenues from Class Members' purchases of the Products. Such enrichment is unjust and inequitable because Defendant knowingly manufactured, marketed, and sold defective and dangerous Products while omitting material facts, causing Plaintiffs and Class Members to purchase products they otherwise would not have bought had the truth been disclosed.

168. Defendant's conduct allows it to knowingly realize substantial revenues from selling the Product at the expense of, and to the detriment of, Plaintiffs and the Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates the principles of fundamental justice, equity, and good conscience.

169. Under common law principles of unjust enrichment and quasi-contract, it is inequitable for the Defendant to retain the benefits conferred by Plaintiffs and Class Members' overpayments.

170. Plaintiffs and Members of the Classes seek disgorgement of all profits resulting from such overpayment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

a. Declare that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representative, and appointing the undersigned counsel as Class Counsel;

b. Award Plaintiffs and Class Members compensatory, statutory, actual, and/or monetary damages, including interest, in an amount to be determined at trial, except for injunctive relief only under the CLRA;

c. Declare that Defendant must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits the Defendant received from the sale of the Products;

d. Order Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Classes;

e. Award punitive damages where permitted by statute, in an amount to be determined at trial, due to Defendant's willful and reckless disregard of the serious risk of the Products' contamination to consumers despite their knowledge of the Defect;

f. Order such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs hereby demands a trial by jury of all claims so triable.

Dated: September 24, 2026 Respectfully submitted,

*/s/ Michael Connett*
Michael Connett (SBN 300314)
Leslie L. Pescia*
Rachel N. Minder*
**SIRI & GLIMSTAD, LLP**
700 South Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 376-3739
E: mconnett@sirillp.com
lpescia@sirillp.com
rminder@sirillp.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 599-6072
E: klaukaitis@laukaitislaw.com

**pro hac vice admission anticipated*

*Attorneys for Plaintiffs & Putative Class Members*